And we'll move to our next case this morning. Marion Diagnostic Center v. Becton Dickinson All right. Mr. Ellis, you may proceed. Good morning, and may it please the Court. Justin Ellis for the Plaintiff Appellants, the two downstate medical providers. When we were last here, the Court held that providers could sue under Illinois BRIC if they could show that the distributors consciously committed to Becton's anti-competitive scheme. And it held showing that to a pleading that the distributors do more than just buying and selling Becton's products. What the providers had to allege was a quid pro quo. They've now done that. They conducted a further investigation, which uncovered many more facts about how two distributors in particular, Cardinal and McKesson, substantially helped Becton exclude its rivals from the relevant markets. For example, they found and alleged that the distributors coerce providers into buying only Becton products. The distributors lie to their clients about the availability, price, and quality of competing products. The distributors market Becton products exclusively, even if doing so hurts their self-interest. The distributors oppressively police customers beyond what they're required to do under the contracts. And the distributors evaluate their own employees based on how well those employees prevent customers from buying competing products. The red line of our new complaint at appendix page 837 demonstrates how much extra detail we've now alleged. It shows that Cardinal and McKesson are not innocent middlemen. They are two of the largest companies in the nation. In fact, they're much larger than Becton. And they collude with Becton to exclude its rivals from the markets. Because of the distributors' efforts, Becton can charge up to 36% more than its competitors for these commodity products. Cardinal and McKesson are helping Becton drive up prices that medical providers like our clients, and ultimately patients, pay for health care across the country. The prices are uniformly set by these group purchasing organizations, which is kind of an insurmountable problem here, right? And the distributor choice is up to the provider. The GPOs set the prices with Becton. That's correct. But Becton can only negotiate such high above competitive prices because of what the distributors do to exclude Becton's rivals from the market. That's the critical role here that the distributors play. Because they help make sure that enough providers are buying only Becton products, that Becton's rivals cannot come in and bid down prices to competitive levels. That's how it's possible for Becton to sit across the table from the GPOs and negotiate such extremely high prices. There are other distributors here who are not in the conspiracy that enforce these same contracts. How does that impact the analysis? It does not impact the analysis because these distributors in particular, Cardinal and McKesson, are also taking steps far beyond what they have to do under the contracts in order to make sure their providers are buying only Becton products. Now, there are other distributors out there. They are also enforcing the contracts. However, we should not assume those distributors are not part of the conspiracy or that they're somehow receiving the same benefits as the other providers, as defendants would have you believe. Well, there are no allegations about that. Yeah, that's correct. In fact, evidence may well show, we in fact believe it will show that they are part of the conspiracy, but it's enough to show that these distributors have these captive providers and are able to use them in order to help exclude Becton's rivals. For these specific distributors, we've shown enough to demonstrate that this case should go forward. So we've met our pleading burden, and this case should go forward. I'll first address conscious commitment, and then I'll turn to defendants' arguments about market power and the district court's erroneous standing ruling. Under Twombly, the providers need only show that one plausible explanation of our allegations is that Cardinal and McKesson have agreed with Becton to restrain trade. That standard is not high. The question is still could these things have happened, not did they happen. In antitrust cases, that means that if there is a non-negligible probability of conspiracy, this case should go forward. The district court did not deny. Well, conspiracy to do something unlawful. That's correct. However, the district court did not deny that Becton's arrangements could restrain trade, and the defendants here don't challenge that finding either. The only issue in this case is whether it's been shown that the distributors consciously agreed to the acts, which at this stage it is not contested, are in fact restraining trade. The substantial foreclosure of competition here is in fact not contested. So the only basis the district court had for dismissing this case on the merits was that it thought the distributors' actions could be consistent with their self-interest. But that defies basic pleading standards. Twombly does not impose a rule like the Private Securities Litigation Reform Act, which requires us to knock down competing interpretations of the complaint's allegations. In fact, every court of appeals to consider this issue has held that at the pleading stage, antitrust plaintiffs need not exclude the possibility that the defendants have acted independently. That standard may apply at summary judgment or at trial, but it does not apply on a motion to dismiss. And for good reason. That would flout Twombly by requiring plaintiffs to prove on the pleadings just how probable it is that their claims are true. And it would make it essentially impossible for private plaintiffs to plead vertical restraints like this one. No matter what the case, no matter what the allegations, distributors can always argue, just like they argue here, that they carry out a monopolist manufacturer's wishes simply because they have a unilateral incentive to make money. And there will almost never be direct evidence of agreement to knock down such excuses, because few, if any, conspirators are foolish enough to conspire in the open. The Supreme Court surely did not mean for Twombly to snuff out private suits against vertical restraints that way. Because our allegations show, at the least, a plausible case that these distributors have consciously agreed to coordinate with Becton, the district court was wrong to dismiss the case just because defendants can offer up another reading of the complaint. A lot of your allegations are around enforcing the contract with the GPOs. How is it that enforcing a contract with a third party can be evidence of a conspiracy between those who weren't involved in that? And our first opinion raised those same concerns. And let me just add, so you can address, the first opinion addressed a hub-and-spoke conspiracy as opposed to a vertical one. And it's even harder to plead a vertical than a horizontal hub-and-spoke conspiracy. It is correct that we had to show more than just carrying out the contracts. But we say that the defendants do far more than just that, right? They go out of their way to make sure that these providers are only buying Becton products. Nothing in the contracts requires them to lie to their providers about the availability, for instance, of Becton products or to spy on their providers and to go and inform Becton when they want to buy competitors' products. And those actions are, in fact, contrary to the distributor's self-interest. It's one thing to honor a contract, which you were required to honor. It's another to go out of your way to shore up a monopoly by a manufacturer when, in fact, as we've alleged, the distributor's incentives are to prefer upstream competition as much as possible. Not only do they want to allege, not only do they want to provide their customers as much variety and choice as possible, but they also prefer upstream competition because that increases demand and is going to mean more profits for them. That they instead act contrary to that self-interest is powerful evidence that they have agreed to conspire with Becton. And as far as your question about hub-and-spoke conspiracies versus vertical conspiracies, there's no higher pleading standard for vertical conspiracies. And, in fact, the same basic standards under Twombly should still apply. But you don't have the per se violation benefit. Well, I would note that Cardinal, in fact, does manufacture its own in-house brand of needles under the Govidian brand. And I think it's very telling that Cardinal, in fact, promotes Becton products over its own in-house brand. It doesn't even give its customers… If you're doing a vertical conspiracy or alleging a vertical conspiracy like you are here, you don't have that extra benefit of a per se violation. I'm not saying it's per se. I am saying that's even more powerful evidence of the distributor's intent in the case of Cardinal. And I would say that it's not as if our alleging a vertical conspiracy theory to vertical conspiracy theories undermines our allegations because the central point is these providers cannot easily switch away from distributors once they're locked into the contracts. And that means that, contrary to what the defendants argue, the distributors can't simply come in and undercut each other. That's how, once the distributors have these captive providers, they can do everything we say they do in and outside of the contracts in order to make sure that their providers are buying only Becton products and that Becton's rivals are being excluded from the market. Just to briefly address market power, there is no dispute that the providers here properly allege Becton's market power in the market for buying and selling products. But the dispute here is whether we've alleged enough detail about the distributor's market power in a separate market for distributing these products. That is not necessary for two reasons. First, we've alleged actual anti-competitive effects from this conspiracy, such as higher prices, reduced competition, and reduced quality. Under the Supreme Court's cases in FTC against Indiana Federation of Dentists, pleading market power is not necessary. Second, as we describe in our briefs, whose market power is relevant here is going to depend on the antitrust theory alleged. Our antitrust theory depends on what Becton can do by first imposing these contracts and giving the distributors this opportunity to force their providers to buy only Becton products. It does not depend on whether the distributors have the power to raise their distribution fees, and we don't allege that they do any such thing. So for that reason, the argument the defendants raise about market power is simply a red herring. If market power among the distributors is not required, and it may not be, and you don't have any allegations about market power of the two distributors identified here, wouldn't it be relevant that the other distributors in this area enter into contracts in the same manner and deal with these providers, and there's no allegations that they're part of the conspiracy? So if Cardinal and McKesson don't have market power among distributors, it seems like that weakens, again, your vertical conspiracy. No, it doesn't. Because they have other options who are doing the same thing, they being the providers. It does not because the success of this conspiracy does not depend on the market share of the distributors or their ability to raise distribution fees. That's what defendants would have you believe. The power here, which you could call market power if you like, is the power of the distributors once they have a contractual relationship with the provider to keep those providers from switching away. But doesn't the underlying GPO contract require that? No, it doesn't. There are separate strong reasons why providers can't easily switch away from distributors. So in particular here, most notably— But the GPO contract is what dictates the buying of Beckett's products. It dictates the price. It does not dictate which distributor you choose or what your distributor is going to do. It certainly does not dictate whether the distributor is going to, say, lie to you about whether non-Beckton products are in back order. And I'll note providers can't easily switch away if they're unhappy with such lying because they don't know they're being lied to. They don't know that Beckton is being fed information about their attempts to buy non-Beckton products. They don't know other misconduct of that sort. And besides, as we allege, there are structural features of the market that make it very difficult for distributors to switch away. This is much like the Supreme Court's case in Eastman Kodak, which recognized that even if you don't have market power in the primary market, a contractual relationship can give you the ability to impose anti-competitive restraints so that the conspiracy can be effective. That is the fundamental question here. Can the conspiracy be effective? That's the purpose of the market power inquiry, and we can show that given the difficulty of switching distributors. If there are no further questions, I'd like to reserve the remainder of my time for rebuttal. Thank you. That's fine. Thank you. Mr. Michael. Good morning, Your Honors. May it please the Court. William Michael for Defendant Abile Beckton Dickinson and Company. Plaintiffs have alleged that it is the contracts between BD and the GPOs that, in their words, not only set the price under which providers buy BD products regardless of which distributor they buy from, but also lock providers in for years at a time, effectively force them to buy BD products at the alleged super competitive prices, and forbid them from buying from BD's competitors. All by virtue of contract terms negotiated, set, and put in place between BD and the GPOs without, the plaintiffs admit, without the involvement of any distributor. And plaintiffs go on to explain, paragraph 60 of their Second Amended Complaint, why, given those allegations, all of the conduct that they allege the distributors engaged in, everything that Mr. Ellis described, the alleged lies, the coercion, the pressure tactics, all of that conduct is entirely consistent with the distributors' economic self-interests independent of a conspiracy. Paragraph 60 of the Second Amended Complaint alleges that distributors benefit directly from buying and selling BD products under the terms of the contracts that BD has negotiated with the GPOs in two ways. One, because distributors charge a percentage markup on the prices that are set under those contracts, they get a higher markup when there's a higher price. And two, because the contracts between BD and the GPOs are allegedly long term, and they're allegedly exclusive dealing contracts, the distributors are able to enjoy more guaranteed purchasing volume than they otherwise would have. By definition, those are benefits that are available to any distributor who buys and sells BD products under the terms of the contracts that BD and the GPOs have negotiated with or without a conspiracy. And as a result, the plaintiff's whole claim that the two distributors are engaged in two separate and independent vertical conspiracies with BD, that whole claim falls apart, because all that they've alleged is conduct that the distributors engage in to drive volume of BD products in a market where, according to their own explanation, it is profitable for any distributors to do that. In that regard, this case is just like the case that this court considered in alarm detection systems versus Village of Schaumburg. In that case, the village did not need to conspire with the manufacturer, Tyco, or with the local dispatch center, NWCDS, to get the benefit of and share in the profits of their long term exclusive dealing arrangement. Similarly here, the distributors do not need to conspire with BD or the GPOs in order to get the benefits the plaintiffs describe of their alleged long term exclusive dealing contracts. And as a result, the complaint offers no plausible reason for the distributors to have joined a conspiracy, and there's no reason to infer a conspiracy. What about the additional allegations that counsel identified about the distributors doing more, going beyond the contract here, cutting off lines of credit, increasing delivery fees, those type of things, which it doesn't look like the district court addressed. It's not a question here of whether those actions are or are not required by contracts with BD. The question is, are they or are they not in the distributor's self-interest, absent a conspiracy? And here they are, again, for the reasons that plaintiffs have explained, because all of those actions are actions to drive volume of BD products in a market where, according to the plaintiffs themselves, it's profitable and beneficial for distributors to do that. Indeed, given the allegations that the contracts between BD and the GPOs put in place before the distributors get involved effectively force providers to buy BD products, it's questionable whether the distributors have any choice. But clearly, they've alleged that it's beneficial and profitable to do that. And for the same reasons, none of the benefits that they allege to make up the supposed quid pro quo depend on there being a conspiracy, nor do they support an inference of conspiracy. We already talked about the higher markups and guaranteed volume. Those are benefits any distributor can get, so that's not a quid pro quo. And those are set by the group purchasing organization contracts, are they not? The prices and other terms of sale are set by the group purchasing organization contracts, and the plaintiffs allege it's in distributors' benefit to buy and sell any of those products. Including the volume discount and the rest of it, or penalty, depending on how you characterize it. Exactly, exactly, Your Honor. All of that is set by the group purchasing contracts. Now, Mr. Ellis said that BD needs the distributors in order to charge those high prices. There are two problems with that. One, that's contrary to the allegations of the complaint, which are that BD negotiates the prices and the other terms with the GPOs without the distributors' involvement, and before a provider even chooses a distributor. But if it were the case, if BD actually needs the distributors' involvement in order to charge high prices, then the complaint makes no sense. Because, again, what they've alleged are two separate and independent vertical conspiracies with two distributors out of many in the marketplace. And how does it make any sense that BD would be able to negotiate and enter into conspiracies to exclude competitors if it's doing that only with two individual distributors, neither of whom is alleged to have market power? My colleague, Mr. Brody, will elaborate on that point. But the last point I want to touch on is the other set of— Or in a separate conspiracy. He conceded that's not pled, and I thought it was telling that he said, in the conspiracy. Again, that's a claim that the plaintiffs have abandoned. It's not a single conspiracy. They're not even purporting to claim that. The last point I want to touch on is the other set of benefits that's alleged in the contracts, the payments that BD allegedly makes to distributor salespeople. What plaintiffs allege about those payments is that paragraph 59 of the Second Amendment of the complaint, they say, in exchange for promoting Becton products, distributor sales personnel are paid bonuses by BD, and BD shares in the cost of incentive programs that are based on the amount of Becton products that they sell. And there are two points to highlight quickly there. One, this court already held in its prior opinion—I believe it's page 837—that distributors getting paid for promoting BD products does not give rise to an inference of a conspiracy. And two, the fact that those payments are based on volume just reinforces the point. Those payments are based on driving volume. Again, that's inconsistent with the idea of a conspiracy, but fully consistent with the distributors acting in their own economic self-interests. And there are no allegations that those individual salespeople who got the money were at any knowledge of any alleged conspiracy, are there? There are no allegations like that as to the individual salespeople. Thank you. Thank you, Your Honors. Mr. Brody. Thank you, Chief Judge, and may it please the Court, Michael Brody on behalf of the two distributor defendants. To allege a plausible vertical claim, the plaintiffs must allege an agreement to form an anti-competitive combination, and that that agreement must withstand the forces of competition. Today I'd like to address the impact of market power primarily on that second point, whether this alleged agreement is plausible in light of the allegations about the forces of competition. I'm also going to address the standing argument before I rest. Mr. Brody, and maybe you'll clarify this in your statements, are you arguing that in order to plead a claim, there has to be this second level of market power among the distributors, or are you arguing that based on the way the allegations are in this case, that the claim can't succeed without that market power? I'm certainly arguing the second point. On the allegations made by the plaintiff, you need market power. Could a plaintiff allege a vertical combination that didn't have it? Maybe. There are a number of cases from this Court, and we cite them in the briefs, that have the general statement that you need to show market power. But as applied in this case, you need market power. Before I dive into market power, I want to address the point that I think we all agree on, which is that the allegations are judged on what they say, not on the labels attached to them. And Mr. Ellis spent time talking about the exclusive relationships and how the distributors are tied to things and so on. The complaint is very different. Paragraph 44 and 45 talk about the distribution agreements. They don't say they're exclusive. Paragraph 55 talks about the distribution agreements and says those agreements may require providers to buy a certain percentage from a single distributor. Not must, not do, may. And it says a certain percentage, but it doesn't say what that percentage is. These are contracts the plaintiffs have. They were entered into with them. We're now on the second amended complaint, so let's look at the allegations, and they don't really talk about this exclusive relationship the way we hear from counsel. But turning to market power, the facts alleged in the second amended complaint show that this conspiracy is not plausible. We know there are other non-conspiring defendants. They are not alleged to be in any conspiracy. The plaintiffs pick the distributors they want to deal with. All distributors charge the same price, a price that's set in a contract plaintiffs' agents, the group purchasing organization, negotiate. Cardinal and McKesson are not alleged to have market power. They don't have the ability to constrain terms or raise price. And importantly, and this is plaintiff's allegation, paragraph 61, the customers can go elsewhere. If they don't like what the distributors have done, they can go elsewhere. If they wish to avoid the alleged sharp elbows of the distributors, they can go elsewhere. In light of those allegations, it is not plausible that the distributors would do anything other than action that is in their independent self-interest. Had the complaint contained some allegations of ways in which the distributors could get the money back if they lost business, we'd be dealing with a different allegation. We don't have that. As Mr. Michael stated, the only allegations are that the distributors make money by selling product, not by failing to sell product. So given that the market power allegations show there are other people out there, it's implausible that a conspiracy here exists and could be effective to raise price. Now, plaintiff relies on the cat's paw cases, and those are interesting cases, and I'd like to talk about one of them, the Piazza Motor Fuels case. In that case, a group of conspiring road contractors got the asphalt manufacturers to agree not to sell to their competitor and enforce the conspiracy, and plaintiff looks to that. In that case, however, the cat's paw, the asphalt manufacturer, had claws. They had an actual conspiracy among themselves. It was alleged to be a horizontal conspiracy among the plants, and they restrained the sales to others. Here, the allegation is quite different. O&M and Shine and these other major manufacturers are out there selling to these same customers at the same price. So if the distributors were to choose to lie or to deceive their customers, they wouldn't be able to hold on to their customers. They would go elsewhere, and there's no quid pro quo for that lost business. The same thing can be said of the other cases that they cite, the Meritor, the Dentsply, and McWane cases. Aside from the fact that they are often Section 2 cases and some are government enforcement cases that do not have the Illinois BRIC rule as an issue, they are vertical restraint issues where a dominant manufacturer imposed a restraint upon a distributor and its customers. They're not conspiracy cases. So here, in the absence of market power, it's implausible that McKesson or Cardinal could conspire with Becton to treat their customers poorly. They lack the ability to affect price or terms of commerce, and they lack the ability to prevent their customers from going elsewhere. Let me turn to the standing point, and this is an argument that affects Cardinal. It would also affect the plausibility of a conspiracy involving just McKesson. Plaintiffs allege there are two independent conspiracies, and they concede they did not purchase from the Becton-Cardinal conspiracy. So how do they have standing to sue Cardinal? Well, the law is clear. The plaintiffs must show a concrete and particularized impact traceable to the alleged wrong. So to sue Cardinal, they must show some impact traceable to Cardinal. By conceding they didn't purchase from Cardinal, they concede the primary way that's shown, purchasing from a conspiracy, doesn't apply. So instead they say Cardinal affected the price that they paid when they bought from McKesson. That's not what the complaint says. First, the plaintiffs plead that no distributor had anything to do with the prices that were set. They were set by the group purchasing agreements, plaintiff's agent. Second, the complaint refutes an allegation that Cardinal's conduct affected the McKesson price. Paragraph 106, plaintiffs allege the Becton-Cardinal conspiracy caused customers purchasing directly from Becton or Cardinal to pay above competitive prices. And likewise, paragraph 113, count two against McKesson, the flip side says the McKesson conspiracy affected McKesson customers. There's no allegation that anything Cardinal did affected the price McKesson's customers paid. That's not in the complaint. In reply they state Cardinal's conspiracy with Becton prevented manufacturers from bidding down the price, other manufacturers from entering and bidding down the price. We know that's not true. The price is set by the GPO contract and there are other distributors and other manufacturers out there. There's nothing that would prevent another manufacturer from going to one of these other distributors and going into business and competing on the contract. So we invite the court to affirm the decision below. The allegations of conspiracy are not plausible and there is no allegation of standing as to Cardinal. Thank you. Thank you. Mr. Ellis. Thank you. Just a few quick points. First, Mr. Michael gave the game away by arguing that the reason this case should be dismissed is that the defendant's action could be consistent with their self-interest. That's not the standard. Twombly does not allow cases to be dismissed just because our allegations could be consistent with self-interest. We are not required to exclude the possibility of independent conduct. Two, Mr. Michael also argued that the distributors are superfluous, citing the Schomburg case. The distributors here are not superfluous. As I described, they go above and beyond in order to lock their providers into beckoning contracts. Mr. Michael had no response to that. Three, Judge St. Eve, you asked whether we had to allege that the sales staff knew of a conspiracy. We're not required to do so under Rule 8. Knowledge and intent can be alleged generally. Four, Mr. Brody talked about- to impute the sales rep's knowledge and actions to the company itself. That was the point of the question. We do describe in our complaint how the distributors and the sales staff are large-scale market participants. They're in regular contact with each other. They would have reason to know what each other are doing. The distributor sales staff, for instance, are in regular communication with Becton. But I'm not-well, we'll leave it at that. If there's no further questions, I'd ask that the judgment be reversed. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.